1

2

3

4             UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7    HEATHER L.,[1]                        Case No. 19-cv-02483-SI

8                Plaintiff,

9        v.                               **ORDER RE: CROSS-MOTIONS FOR
                                          SUMMARY JUDGMENT**
10   ANDREW SAUL,[2]
                                          Re: Dkt. Nos. 16, 22
11               Defendant.

12

13        In this Social Security appeal, plaintiff Heather L. seeks a finding that she was disabled for

14   a closed period from May 31, 2013, through April 21, 2017.  Dkt. No. 16.  Defendant opposes and

15   cross-moves for summary judgment.  Dkt. No. 22.  Having considered the parties' papers and the

16   administrative record, the Court hereby REVERSES the decision of the Commissioner of Social

17   Security and REMANDS this matter pursuant to sentence four of 42 U.S.C. § 405(g).

18

19                              **BACKGROUND**

20   **I.    Procedural History**

21        In April 2015, plaintiff Heather L. filed a protective application for Social Security Disability

22   Insurance Benefits ("SSDI" or "DIB") under Title II of the Social Security Act.[3]  Administrative

23   _____

24        [1] The Court partially redacts plaintiff's name to mitigate privacy concerns, as suggested by
     the Committee on Court Administration and Case Management of the Judicial Conference of the
25   United States.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

26        [2] Andrew Saul, Commissioner of Social Security, is substituted for his predecessor, Nancy
     A. Berryhill, pursuant to Federal Rule of Civil Procedure 25(d).

27        [3]  A protective filing date marks the time when a disability applicant makes a written
28   statement of his or her intent to file for SSDI benefits.  SSDI is available to people who have worked
     for employers who paid taxes to Social Security.  The date SSDI eligibility ends is the "date last

United States District Court
Northern District of California

Record ("AR") at 18, 224-25.  She alleged a disability onset date of May 31, 2013.  *Id.* at 18.  Her application was denied initially and upon reconsideration.  *Id.*  Plaintiff's application was then heard by Administrative Law Judge ("ALJ") Michael A. Cabotaje on September 15, 2017.  *Id.*  In a decision dated January 24, 2018, the ALJ determined that plaintiff's date last insured was December 31, 2016, and that plaintiff was not disabled from May 31, 2013, through December 31, 2016.  *Id.* at 30.  The ALJ therefore denied plaintiff's claim.  *Id.* at 31.

Plaintiff requested review of the ALJ's decision before the Appeals Council, and the Appeals Council granted review in February 2019.  *Id.* at 4.  On March 12, 2019, the Appeals Council issued an unfavorable decision, which became the final decision of the Commissioner.  *Id.* at 1-9.  The Appeals Council disagreed with the ALJ's calculation of plaintiff's date last insured and found that the correct date last insured was at least September 30, 2018.  *Id.* at 5.  The Appeals Council otherwise agreed with the ALJ's conclusions and found that plaintiff was not disabled from the alleged disability onset date through January 24, 2018, the date of the ALJ's decision.  *Id.* at 6-7.  The Appeals Council thus denied the claim for DIB.  *Id.* at 7.

On May 8, 2019, plaintiff filed this action for judicial review pursuant to 42 U.S.C. § 405(g).  Dkt. No. 1.  On October 21, 2019, plaintiff moved for summary judgment.  Dkt. No. 16 ("Pl.'s Mot.").  On February 3, 2020, defendant filed an opposition and a cross-motion for summary judgment.  Dkt. No. 22 ("Def.'s Cross-Mot.").  Briefing was completed when plaintiff filed a reply brief on March 25, 2020.  Dkt. No. 25.

## II.      Medical and Vocational History

### A.      Medical History

At the time of the hearing before the ALJ in September 2017, plaintiff was 48 years old, with

---

insured."  The claimant has the burden of proof to demonstrate that she was disabled prior to the date last insured.  *See Armstrong v. Comm'r of Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir. 1998) (citing 42 U.S.C. § 423(c)).  If an applicant establishes a protective filing date before the "date last insured," the applicant will still be eligible for SSDI even if the application is completed after the date last insured.  *See* 20 C.F.R. § 404.630; *see generally* 2A Jean E. Maess, <u>Social Security: Law and Practice</u> § 30.24 *et seq.* ("Protective Filings") (June 2019); *see also* 42 U.S.C. § 423; 20 C.F.R. § 404.130(b).

United States District Court
Northern District of California

a long history of back pain.  (She turned 49 before the ALJ's decision was issued.)  *See* AR at 29. In her disability application, she listed the following conditions as limiting her ability to work: degenerative disc disease, failed fusion, cervical spine; degenerative disc disease, failed fusion, lumbar spine; denervation of right oblique; piriformis syndrome; chronic pain; autoimmune disease; fatigue; depression; and anxiety.  *Id.* at 244.  Plaintiff also had a history of obesity, with her body mass index consistently above 30.0.  *Id.* at 25.

Plaintiff was previously found disabled by an ALJ for a closed period of disability from August 7, 2010, to May 16, 2013.[4]  *Id.* at 41.  Between 2007 and the time of the September 2017 administrative hearing, plaintiff had five surgeries, *id.* at 51, including cervical spinal fusion surgery in November 2012.  *Id.* at 41.  In 2014, she also suffered from edema several times, suddenly gaining fifteen to thirty pounds within the span of a couple of days.  *Id.* at 63.  She has been on various medications over the years, for both her physical pain and for mental health.  During the summer of 2014 and the first half of 2015, she was on various medications, including hydromorphone, Norco, and fentanyl.  *Id.* at 61-62.  At the time of her benefits application in April 2015, she was on Ativan, Lexapro, oxycodone, oxymorphone, voltaren gel, Wellbutrin, and Zolpidem.  *Id.* at 247.  On December 3, 2015, she underwent a procedure to install a spinal infusion pain pump to better control her pain, following a successful spinal cord stimulator trial administered a few months prior.  *Id.* at 42, 51, 567-68.

### B.    Vocational History

Plaintiff has at least a high school education and prior work experience in horse training, retail management, and the hospitality/hotel industry.  *Id.* at 30, 47.

In January 2009, plaintiff began working on her master's degree in therapy, specializing in equine therapy.  *Id.* at 42, 50.  The degree was primarily done online.  *Id.* at 50.  She began an

---

[4] At the hearing before the ALJ in this case, plaintiff's attorney stated that the prior ALJ suggested she should accept a closed period of disability on the theory that she should be well enough to work six months after her cervical spinal fusion surgery in November 2012; however, plaintiff in fact "never quite [got] back to the point where she could go back to work."  AR at 41-42.

United States District Court
Northern District of California

internship doing equine therapy in the summer of 2013, for about a year total.  *Id.* at 42, 53-54.  She testified that she was able to work a maximum of one hour at a time for about five hours total per week.  *Id.* at 53.  In June 2014, she had an adverse reaction to a medication and was unable to meet with her client one day.  *Id.* at 54.  Shortly thereafter, she was dismissed from the internship and was then terminated from her master's program in October 2014.  *Id.* at 55-56, 58-59.

After she received the pain pump in December 2015, she took a part-time job in a retail store in Calistoga.[5]  *Id.* at 43.  In early 2016, she began volunteering at Jameson Animal Rescue Ranch, an animal rescue shelter, collecting signatures for a ballot initiative for a few hours at a time, two days a week.  *Id.* at 69-70.  On April 22, 2017, she began part-time employment (working twenty to twenty-five hours per week) at Jameson Ranch, for which she was paid above the "substantial gainful activity" level.  *Id.* at 43.  Therefore, plaintiff requested a closed period of disability ending April 21, 2017.  *Id.*  Plaintiff was still employed at Jameson Ranch at the time of her hearing before the ALJ.  *Id.* at 45.

### III.    Medical and Vocational Evidence

#### A.  Drs. Pancho, Allen, Billik, and Heldman (State Agency Medical and Psychological Consultants)

State agency medical consultants L. Pancho, M.D., and J. Allen, M.D., each opined on June 26, 2015, and October 14, 2015, respectively, that plaintiff could occasionally lift, carry, push, and pull ten pounds; frequently lift, carry, push, and pull less than ten pounds; stand or walk two hours in an eight-hour day; and sit about six hours in an eight-hour day.  *Id.* at 104, 124.

State agency psychological consultants Harvey Billik, Psy.D., and Patricia Heldman, M.D., each opined on July 1, 2015, and October 9, 2015, respectively, that plaintiff was moderately limited in her ability to maintain concentration, persistence, and pace; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond

---

[5] The ALJ did not consider that position for purposes of past relevant work in the five-step disability evaluation.  *See* AR at 48.

appropriately to changes in the work setting. *Id.* at 105-06, 125-26. They stated that plaintiff could carry out simple and detailed, but perhaps not complex, instructions over the course of a normal workweek. *Id.* They also expressed that plaintiff could adapt to simple changes in work procedures. *Id.*

### B.      Dr. Weisbein (Treating Physician)

Jacqueline Weisbein, D.O., plaintiff's treating physician, submitted a medical source statement dated May 22, 2015. *Id.* at 443-49. She stated that plaintiff was not capable of performing sustained sedentary work on a regular and continuing basis.[6] *Id.* at 444. She opined that plaintiff could sit for twenty minutes at a time, could stand or walk for up to two hours at a time, and must lie down for eight hours during an eight-hour workday. *Id.* at 445. She asserted that plaintiff could lift or carry up to five pounds for up to two hours during an eight-hour workday. *Id.* She expressed that plaintiff could reach for four hours, handle for two hours, finger for two hours, and feel for two hours during an eight-hour workday, but that plaintiff could not stoop, kneel, or crouch. *Id.* at 446-47. She noted that plaintiff had moderately severe limitations in her ability to complete a normal workday and workweek without interruptions from medically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 448. She opined that plaintiff would likely be absent from work more than four days per month. *Id.* at 449.

On March 9, 2017, Dr. Weisbein submitted another medical source statement. *Id.* at 510-16, 864-70, 873-79. She continued to find that plaintiff was not capable of performing sustained sedentary work on a regular and continuing basis. *Id.* at 511, 865, 874. She opined that plaintiff

---

[6] Social Security regulations define "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

could sit for thirty minutes at a time, could stand or walk for up to two hours at a time, and must lie down for eight hours during an eight-hour workday. *Id.* at 512, 866, 875. She asserted that plaintiff could lift or carry up to ten pounds up to two hours during an eight-hour workday. *Id.* at 512-13, 866-67, 875-76. She found plaintiff could reach for four hours, handle for six hours, finger for six hours, and feel for eight hours during an eight-hour workday. *Id.* at 513-14, 867-68, 876-77. She opined that plaintiff could not stoop, kneel, or crouch. *Id.* at 514, 868, 877. She noted that plaintiff had moderate limitations in her ability to complete a normal workday and workweek without interruptions from medically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 515, 869, 878. She opined that plaintiff would likely be absent from work about one day per month. *Id.* at 516, 870, 879.

Additionally, Napa Pain Institute (where plaintiff was treated by Dr. Weisbein and family nurse practitioner Kimberly Schwartz) submitted records of assessments from 2016 and 2017, which noted that plaintiff could perform less than sedentary work. *Id.* at 27, 734-871.

### C.      FNP Schwartz (Treating Nurse)

On May 22, 2015, Kimberly Schwartz, FNP, plaintiff's treating nurse, submitted a medical source statement and a treating physician general medical evaluation. *Id.* at 438-42, 508-09. She noted that plaintiff could lift or carry less than five pounds, could stand or walk twenty minutes at a time and less than two hours in an eight-hour workday, and could sit for twenty minutes at a time and less than six hours in an eight-hour workday. *Id.* at 438, 508. She opined that plaintiff needed to alternate between sitting and standing, needed to change positions frequently, and needed to lie down. *Id.* She asserted that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl. *Id.* at 439, 509. She stated that plaintiff could frequently reach bilaterally and could occasionally handle, finger, and feel bilaterally. *Id.* She opined that plaintiff was limited with respect to exposure to moving machinery, temperature extremes, chemicals, and dusts. *Id.*

### D.      Dr. Wong and MFT De Vries (Treating Psychiatrist and Therapist)

DeeAnn Wong, M.D., plaintiff's treating psychiatrist, submitted an evaluation for mental

United States District Court
Northern District of California

disorders dated June 9, 2015.  *Id.* at 462-68.  Dr. Wong opined that plaintiff had limitations in her ability to maintain concentration, attention, and persistence, and to respond appropriately to changes in a work setting.  *Id.* at 464.  She noted that plaintiff had no limitations in her ability to understand, remember, and carry out simple instructions.  *Id.*  She expressed that plaintiff had light limitations in her ability to understand, remember, and carry out complex instructions; to perform activities within a schedule and maintain regular attendance; and to complete a normal workday and workweek without interruptions from psychologically based symptoms.  *Id.*

Cara De Vries, MFT, plaintiff's treating therapist, submitted an evaluation for mental disorders dated May 28, 2015.  *Id.* at 452-55.  MFT De Vries opined that plaintiff had some limitations in her ability to understand, remember, and carry out complex instructions; to maintain concentration, attention, and persistence; to perform activities within a schedule and maintain regular attendance; and to complete a normal workday and workweek without interruptions from psychologically based symptoms.  *Id.* at 454.

MFT De Vries then submitted a medical source statement dated September 18, 2015.  *Id.* at 503-07.  She opined that plaintiff had no significant mental limitations except for mild limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.* at 504-06.

More recently, MFT De Vries submitted an assessment letter dated September 10, 2017.  *Id.* at 963-64.  She opined that plaintiff was doing well since the pain pump placement in December 2015, and that plaintiff's pain had decreased enough that plaintiff was generally less anxious and more hopeful about her future.  *Id.* at 963.  She also noted that plaintiff had a job for the first time in many years.  *Id.*  She expressed that plaintiff's prognosis was good, but that plaintiff still needed ongoing emotional support and practice in nervous system regulation.  *Id.* at 964.  She also added that plaintiff was going through a time of transition with a new job and in dealing with the recent passing of her father.  *Id.*

United States District Court
Northern District of California

### E.     Vocational Expert

At the September 2017 hearing, vocational expert (VE) June C. Hagen, Ph.D., testified as to plaintiff's past work and answered hypothetical questions posed by the ALJ.  *See id.* at 71-76.

The ALJ asked the VE to consider two hypotheticals.  First, the ALJ described a hypothetical individual of plaintiff's age, education, and work experience, who was limited to light work, to standing/walking for two hours, and to sitting for six hours in an eight-hour workday.  *Id.* at 72.  The VE testified that this person could not perform plaintiff's past work, and that there were no jobs other than at the sedentary classification level that this person could perform.  *Id.*  She testified that such sedentary work would be, for instance, telephone solicitor (semiskilled), check cashier (semiskilled), and document preparer, microfilming (unskilled).  *Id.* at 73.

Second, the ALJ described another hypothetical individual limited to sedentary work and who could sit for thirty minutes, stand for two hours, and walk for two hours per day; he noted that this hypothetical was based on Dr. Weisbein's findings in the recent medical source statement.  *Id.* at 74.  The VE testified that this individual would not be able to perform any of plaintiff's past work and that there would be no full-time jobs available.  *Id.*  The VE additionally opined that, if this individual were absent one day per week or four days per month, there similarly would be no jobs available.  *Id.*  The VE also opined that if the individual were consistently absent twice a month there would be no jobs in the national economy for that person.  *Id.* at 74-75.

## LEGAL STANDARD

### I.     Standard of Review

The Social Security Act authorizes judicial review of final decisions made by the Commissioner.  42 U.S.C. § 405(g).  A court's review of a disability determination is limited, and a final administrative decision may be altered "only if it is based on legal error or if the fact findings are not supported by substantial evidence."  *Sprague v. Bowen*, 812 F.2d 1226, 1229 (9th Cir. 1987); *see also Razey v. Heckler*, 785 F.2d 1426, 1429-30 (9th Cir. 1986) ("The Appeals Council's denial of benefits constitutes a factual determination which we review under the substantial evidence standard.") (citing 42 U.S.C. § 405(g) (1982)).  Substantial evidence is the relevant evidence in the

entire record "which a reasonable person might accept as adequate to support a conclusion." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). Substantial evidence consists of "more than a mere scintilla but less than a preponderance." *Young v. Sullivan*, 911 F.2d 181, 183 (9th Cir. 1990). Courts "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "Where evidence is susceptible to more than one rational interpretation," the ALJ's decision should be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The substantial evidence standard is a deferential standard of review. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

A district court may enter a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). If additional proceedings can remedy defects in the original administrative proceedings, a Social Security case should be remanded. *See Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). A decision of the ALJ will not be reversed for errors that are harmless. *Burch*, 400 F.3d at 679 (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991)).

## II.     The Five-Step Disability Inquiry

A claimant is "disabled" under the Social Security Act if: (1) the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A)-(B). The SSA regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proof for steps one through four and the Commissioner has the burden of proof for step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

1999).

The five steps of the inquiry are:

> 1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).
>
> 3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).
>
> 4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).
>
> 5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  The ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  *Tackett*, 180 F.3d at 1098 n.3.

In between the third and fourth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  20 C.F.R. §§ 404.1520(a)(4), (e), 416.945(a)(5)(1).  To determine the RFC, the ALJ considers the impact of the claimant's symptoms on his or her ability to meet the physical, mental, sensory, and other requirements of work.  *Id.* §§ 404.1545(a)(4), 416.945(e).  The ALJ will evaluate all the claimant's symptoms and the extent to which these symptoms are consistent with evidence in the record.  *Id.*  The evidence can include the claimant's own statements about his or her symptoms, but such statements must be adequately supported by the record in order to establish a disability.  *Id.*  In order to determine whether the claimant's statements are adequately supported, the ALJ must first determine whether the claimant has a medical impairment that could reasonably be expected to produce his or her symptoms, and then must evaluate the intensity and persistence of the claimant's symptoms.  *Id.*  When evaluating intensity and persistence, the ALJ

must consider all of the available evidence, including the claimant's medical history, objective medical evidence, and statements about how the claimant's symptoms affect him or her. *Id.* The ALJ cannot reject statements about the intensity and persistence of symptoms solely because no objective medical evidence substantiates the statements. *Id.* §§ 404.1529(c)(2), 416.929(c)(2). The ALJ must also consider factors relevant to the claimant's symptoms, such as the claimant's daily activities, the claimant's medications and treatment, any other measures the claimant uses to alleviate symptoms, precipitating and aggravating factors, and any other factors relevant to the claimant's limited capacity for work due to his or her symptoms. *Id.* § 416.929(c)(3)(i)-(vii). After determining the RFC, the ALJ proceeds to steps four and five of the disability inquiry.

**AGENCY DECISIONS**

**I.      ALJ's Decision**

At the September 2017 administrative hearing before the ALJ, plaintiff was represented by counsel. AR at 18. The ALJ heard testimony from plaintiff as well as from VE June C. Hagen, Ph.D. *Id.* at 18, 37. No medical expert testified. "At the hearing, the claimant requested a closed period of disability from May 31, 2013, to April 22, 2017." *Id.* at 18.

On January 24, 2018, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act from May 31, 2013, through December 31, 2016. *Id.* at 18-19, 31. In determining plaintiff's disability status, the ALJ applied the five-step disability analysis in accordance with 20 C.F.R. § 404.1520(a). *Id.* at 19. The ALJ calculated plaintiff's date last insured as December 31, 2016. *Id.* at 18, 20.

At step one, the ALJ determined that plaintiff engaged in substantial gainful activity from April 22, 2017, to the date of the hearing. *Id.* at 20. The ALJ also determined that plaintiff did not engage in substantial gainful activity from May 31, 2013, through April 21, 2017, the closed period for which plaintiff was seeking a disability finding. *Id.*

At step two, the ALJ found that through the date last insured plaintiff suffered from the following severe impairments: obesity, degenerative disc disease, and osteoarthritis. *Id.* at 21. The ALJ determined that plaintiff's medically determinable mental impairments of major depressive

1    disorder and anxiety, singly and in combination, were not severe. *Id.*

2        At step three, the ALJ found that through the date last insured plaintiff's impairments or

3    combination of impairments did not meet or medically equal the severity of any impairment in the

4    Listing of Impairments, including Listings 1.02(A) (major dysfunction of a major peripheral weight

5    bearing joint) or 1.04 (disorders of the spine). *Id.* at 22-23.

6        Before proceeding to step four, the ALJ examined plaintiff's residual function capacity

7    ("RFC"). In assessing the RFC, the ALJ evaluated plaintiff's testimony and the medical evidence

8    and weighed the opinions of plaintiff's treating physicians and the agency non-examining

9    physicians. Specifically, the ALJ gave "great weight" to the opinions of the State agency medical

10   consultants Dr. Pancho and Dr. Allen, who opined that plaintiff "could occasionally lift, carry, push,

11   and pull 10 pounds; frequently lift, carry, push, and pull less than 10 pounds; stand or walk two

12   hours in an eight-hour day; and sit about six hours in an eight-hour day . . . ." *Id.* at 25 (citing Ex.

13   B2A; B4A). The ALJ gave "little weight" to the opinions of State agency psychological consultants

14   Dr. Billik and Dr. Heldman, who found that plaintiff "was moderately limited with respect to her

15   ability to maintain concentration, persistence, and pace; to complete a normal workday and

16   workweek without interruptions from psychologically based symptoms and to perform at a

17   consistent pace without an unreasonable number and length of rest periods; and to respond

18   appropriately to changes in the work setting." *Id.* The ALJ also gave "little weight" to the opinion

19   of plaintiff's treating nurse, FNP Schwartz, who opined that plaintiff "could lift and carry less than

20   five pounds; stand and/or walk 20 minutes or less at one time and less than two hours in an eight-

21   hour workday; [and] sit for 20 minutes at one time and less than six hours in an eight-hour

22   workday[,]" among other limitations. *Id.* The ALJ gave "little weight" to the opinion of plaintiff's

23   treating physician Dr. Weisbein, finding Dr. Weisbein's limitations were "too extreme and [were]

24   not consistent with treatment notes . . . ." *Id.* at 26. Dr. Weisbein had opined that plaintiff "could

25   not even perform sedentary work on a regular and continuing basis" and that plaintiff would likely

26   be absent from work more than four days per month (as of the May 2015 medical source statement)

27   or about one day per month (as of the March 2017 medical source statement). *Id.* The ALJ gave

28   "partial weight" to the opinion of Dr. Wong, who opined that plaintiff "was limited with respect to

United States District Court
Northern District of California

her ability to maintain concentration, attention, and persistence, and to respond appropriately to changes in a work setting." *Id.* at 26. The ALJ gave "partial weight" to Ms. De Vries's opinion that plaintiff "had some limitations in her ability to understand, remember, and carry out complex instructions; to maintain concentration, attention, and persistence; to perform activities within a schedule and maintain regular attendance; and to complete a normal workday and workweek without interruptions from psychologically based symptoms." *Id.* at 26-27. However, the ALJ gave "great weight" to Ms. De Vries's opinion that plaintiff "had no significant mental limitations except for mild limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (Ex. B11F)." *Id.* at 27. The ALJ gave "little weight" to the opinions from Napa Pain Institute indicating that plaintiff could perform less than sedentary work. *Id.* Finally, the ALJ gave "partial weight" to the third party medical source statement completed by plaintiff's mother, in which she expressed that plaintiff could not stand or sit for more than two or three hours and that plaintiff had difficulties lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs. *Id.* at 27. The ALJ found that plaintiff's own testimony regarding her symptoms' severity was inconsistent with the medical evidence. *Id.* at 24, 28-29. In light of the above assessment, the ALJ found that through the date last insured plaintiff had the RFC "to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a)." *Id.* at 23.

Continuing to step four, the ALJ relied on testimony from the VE to find that plaintiff was unable to perform "past relevant work" through the date last insured.[7] *Id.* at 29. The VE testified that plaintiff's past relevant work in retail management was classified as light, skilled work, with a specific vocational preparation (SVP) level of 7, and that plaintiff performed the job at the medium exertional level.[8] *Id.* at 72. The VE testified that plaintiff's past relevant work as a horse trainer

---

[7] "Past relevant work" means substantial gainful activity performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years or fifteen years prior to the alleged disability onset date. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.

[8] "Specific vocational preparation" (SVP) means the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. 20 C.F.R. § 656.3.

was medium, skilled work with an SVP of 7, which plaintiff performed at the heavy exertional level. *Id.*

At step five, the ALJ relied on section 204.00 of the Medical-Vocational Guidelines to find that through the date last insured, considering plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could have performed. *Id.* at 30. The ALJ therefore found plaintiff was not disabled within the meaning of the Social Security Act at any time from May 31, 2013, through December 31, 2016. *Id.*

## II.     Appeals Council's Decision

After granting review of the ALJ's decision, the Appeals Council issued an unfavorable determination on March 12, 2019. AR at 1. The Appeals Council adopted the ALJ's statements regarding the issues in the case and the evidentiary facts. *Id.* at 4. The Appeals Council also adopted the ALJ's "findings or conclusions regarding whether the claimant is disabled." *Id.* The Appeals Council agreed with the ALJ's findings under steps 1, 2, 3, 4, and 5 of the five-step sequential disability inquiry. *Id.* The Appeals Council also adopted the ALJ's RFC finding that plaintiff "had the residual functional capacity to perform the full range of sedentary work (Finding 6, decision page 9)." *Id.* "However, the Appeals Council [did] not agree with the Administrative Law Judge's finding the claimant's date last insured is December 31, 2016." *Id.* at 5. Because plaintiff returned to work in 2016, she continued earning coverage to remain insured for Social Security disability benefits. The Appeals Council found that her date last insured for purposes of coverage was "at least September 30, 2018." *Id.* The Appeals Council further explained, "Although the ALJ used the wrong date last insured, the decision evaluates the relevant evidence for the period through January 24, 2018, the decision date." *Id.* Based on plaintiff's age, education, and past work experience and the finding that she could perform the full range of sedentary work, the Appeals Council found plaintiff not disabled through January 24, 2018. *Id.* at 5-6. In other words, the Appeals Council adopted the findings of the ALJ at all steps of the five-step disability inquiry, as well as the RFC finding, and reached the same conclusion that the ALJ reached, with the exception that it found plaintiff not disabled through January 24, 2018 (the date of the ALJ decision), rather

than through December 31, 2016 (the erroneous date last insured that the ALJ calculated).

## DISCUSSION

Plaintiff moves for summary judgment, seeking a determination that the Commissioner's unfavorable decision is erroneous. Specifically, plaintiff argues that the RFC finding is defective because the ALJ erred in giving "little weight" to the opinions of plaintiff's treating physician and nurse, Dr. Weisbein and FNP Schwartz. Plaintiff also contends that the ALJ erred in discrediting plaintiff's testimony by failing to provide specific, clear and convincing reasons.

Defendant cross-moves for summary judgment, arguing that the ALJ properly assessed the medical opinions and provided valid reasons for discrediting plaintiff's testimony.

## I.     Opinion of Treating Physician Dr. Weisbein

Plaintiff argues the ALJ erred in evaluating the medical opinion testimony of plaintiff's treating physician, Dr. Weisbein. Plaintiff contends that the ALJ failed to provide clear and convincing reasons or specific and legitimate reasons for rejecting her opinions. Plaintiff also argues the ALJ erred in discounting the opinions without applying the factors for weighing a treating physician's opinion as provided in the Social Security regulations.

In this circuit, courts distinguish among the opinions of three types of physicians: (1) treating physicians who have an established relationship with the claimant; (2) examining physicians who see the claimant but do not treat her; and (3) non-examining physicians who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a treating physician should be given greater weight than that of an examining or non-examining physician. *Id.* Similarly, an examining physician's opinion usually should be given more weight than that of a physician who has not examined the claimant. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

For claims filed before March 27, 2017, such as plaintiff's, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).   As such, the ALJ must provide clear and convincing reasons to reject the uncontradicted opinion of a treating or examining physician. *Lester*, 81 F.3d at 830.  Even where a treating or examining physician's opinion is contradicted by another physician's opinion, an ALJ may not reject the opinion without "specific and legitimate reasons that are supported by substantial evidence" in the record. *Garrison*, 759 F.3d at 1012; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

The "substantial evidence" standard requires an ALJ to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Reddick*, 157 F.3d at 725.  Conclusory statements by the ALJ are insufficient; he "must set forth [his or] her own interpretations and explain why they, rather than the doctors', are correct." *Id.*  An ALJ errs if he "does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another[.]" *Garrison*, 759 F.3d at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

Here, Dr. Weisbein's opinions are contradicted by the opinions of Drs. Pancho and Allen. In her May 2015 medical source statement, Dr. Weisbein opined that plaintiff could lift or carry up to five pounds for up to two hours during an eight-hour workday; stand or walk for up to two hours at a time; and sit for twenty minutes at a time.  AR at 445.  In March 2017, Dr. Weisbein likewise opined that plaintiff was not capable of performing sustained sedentary work on a regular and continuing basis. *Id.* at 511.  In their June and October 2015 statements, state agency consultants Drs. Pancho and Allen opined that plaintiff could occasionally lift, carry, push, and pull ten pounds; frequently lift, carry, push, and pull less than ten pounds; stand or walk two hours in an eight-hour day; and sit about six hours in an eight-hour day. *Id.* at 104, 124.  Since Dr. Weisbein's opinions are contradicted by the state agency doctors' opinions, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence" in the record to reject her opinions. *See*

United States District Court
Northern District of California

1    *Garrison*, 759 F.3d at 1012.

2         In the ALJ's decision, the ALJ provided the following reasons for rejecting Dr. Weisbein's

3    opinions:

4         These opinions are given little weight as they are too extreme and are not consistent
          with treatment notes indicating that the claimant went to the gym three or four times
5         per week and noting that she reported that her pain symptoms were much improved
          with use of her implanted pain pump and that she was happy with her level of pain
6         control (Ex. B17F/14, 17, 25).

7    AR at 26.

8         The Court finds that these are not specific and legitimate reasons for rejecting Dr. Weisbein's

9    opinions.  First, merely stating that the opinions are "too extreme," without providing further

10   explanation, is conclusory and does not meet the "specific and legitimate reasons supported by

11   substantial evidence" standard.  *See Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir.1988) ("To say

12   that medical opinions are not supported by sufficient objective findings . . . does not achieve the

13   level of specificity our prior cases have required, even when the objective factors are listed

14   seriatim."); *see also Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299 (9th Cir.

15   1999).  Moreover, in rejecting Dr. Weisbein's opinion, the ALJ cited only to Exhibit B17F at pages

16   14, 17, and 25, which are three pages of treatment notes from Dr. Jeanette Williams, M.D., that post-

17   date the December 2015 placement of plaintiff's pain pump.  Plaintiff began seeing Dr. Williams in

18   October 2015 for various other physical ailments while Dr. Weisbein continued to treat plaintiff for

19   pain management.  *See AR at 938.*  The three treatment notes the ALJ cites are not a specific and

20   legitimate reason to discount the opinions of Dr. Weisbein, particularly where Dr. Williams noted

21   that plaintiff's pain symptoms and medications continue to "be[] managed by Dr. Weisbein."  *See*

22   *id*.  Moreover, Dr. Williams's observations in January 2016 that plaintiff was "very happy with the

23   resulting pain control since [the pump placement]," and in February 2017 that plaintiff "has returned

24   to the gym and is back to 3-4 days per week" are not at odds with the opinion of Dr. Weisbein.  *See*

25   *id.* at 26, 941, 949.  These observations have no bearing on the opinion that Dr. Weisbein provided

26   before placement of the pain pump.  And after placement of the pain pump, Dr. Weisbein similarly

27   noted that plaintiff's "function has improved since placement of pain pump, however she continues

28   to have some physical limitations."  *Id.* at 516.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Furthermore, the ALJ did not assess or inquire into what plaintiff's return to the gym

2    entailed.  The mere fact that plaintiff was going to the gym three or four days per week as of February

3    2017, without any further information about the kind and level of exercise(s) engaged in or the

4    duration of that activity, is not a specific and legitimate reason to discount treating physician Dr.

5    Weisbein's opinion.  The ALJ had an affirmative duty to assist plaintiff in developing the record at

6    every step of the five-step disability inquiry.  *See Tackett*, 180 F.3d at 1098 n.3.  The ALJ did not

7    do so here, but instead repeatedly cited (four times) to Dr. Williams's note that plaintiff was going

8    to the gym.  One treatment note saying that plaintiff was going to the gym 3-4 times per week,

9    without further explication, does not provide a specific and legitimate reason to reject the opinion

10   of a treating physician such as Dr. Weisbein who saw plaintiff regularly over the course of several

11   years.

12   The ALJ also failed to apply the factors set forth in 20 C.F.R. § 404.1527(c)(2)(i-ii) and

13   (c)(3)-(6) in according Dr. Weisbein's opinions "little weight."  Those regulations "provide that,

14   when a treating source's opinions are not given controlling weight, an ALJ must apply the factors

15   in 20 C.F.R. § 404.1527(c)(2)(i-ii) and (c)(3-6) in determining how much weight to give each

16   opinion."  *Garrison*, 759 F.3d at 1012 n.11.  These factors include the length of the treatment

17   relationship and the frequency of examination, the nature and extent of the treatment relationship,

18   supportability, consistency, and specialization.  Here, the ALJ did not discuss any of these factors,

19   many if not all of which weigh in favor of giving Dr. Weisbein's opinions controlling weight.  Dr.

20   Weisbein was plaintiff's treating physician since June 2013, *see* AR at 362, and thus had been

21   treating and examining plaintiff since roughly the beginning of plaintiff's requested disability

22   period.  Moreover, Dr. Weisbein is a physician specializing in pain medicine, and she was the

23   surgeon who placed the pain pump in December 2015.  *Id.* at 567-68.  Prior to placement of the pain

24   pump, Dr. Weisbein performed numerous procedures on plaintiff, such as several bilateral sacroiliac

25   joint injections for plaintiff's sacroiliitis, a left knee intra-articular joint injection for plaintiff's

26   osteoarthritis, and a spinal cord stimulator trial.  *See, e.g., id.* at 42, 357-61.  Additionally, Dr.

27   Weisbein's second medical source statement is dated March 2017, *id.* at 510-16, 864-70, 873-79,

28   which shows that she was able to observe plaintiff's functional limitations near the end of the

requested disability period. Without discussing any of these factors, the ALJ gave "little weight" to the opinions of plaintiff's main treating physician, while simultaneously giving "great weight" to the opinions of State agency medical consultants, Drs. Pancho and Allen, who never examined plaintiff. The ALJ's failure to consider the factors outlined in the regulations "alone constitutes reversible legal error." *See Trevizo*, 871 F.3d at 676.

In sum, the ALJ erred both by rejecting Dr. Weisbein's opinions without providing specific and legitimate reasons supported by substantial evidence in the record and by failing to apply the factors set forth in the regulations.

## II.    Plaintiff's Symptom Testimony

Plaintiff also contends that the ALJ improperly discounted her testimony about symptom severity without providing specific, clear and convincing reasons supported by substantial evidence in the record.

The Ninth Circuit has established a two-step analysis for determining how to credit a claimant's symptom testimony:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. . . .
>
> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

*Trevizo*, 871 F.3d at 678 (quoting *Garrison*, 759 F.3d at 1014-15). If the ALJ finds the claimant's allegations of severity are not credible, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain."

*Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (internal quotation marks and citation omitted).

Here, at the first step of the credibility test, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" AR at 28. The ALJ made no finding of malingering. Moving to the second step of the credibility analysis, the ALJ found plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." *Id.* The ALJ then stated the following reasons for discrediting plaintiff's testimony about her symptoms of pain and limitations: (1) plaintiff reported that she engaged in various daily activities, such as laundry, vacuuming, dusting, cleaning toilets and showers, driving, and going shopping in stores; (2) plaintiff testified that she was able to perform in an internship, in which she met with clients doing equine facilitated psychotherapy and traveled to Idaho for a five-day intensive therapy training in 2013; (3) plaintiff also testified that she began volunteering for the Jameson Animal Rescue Ranch in early 2016, collecting signatures for a ballot initiative; (4) treatment notes indicate that plaintiff was going to the gym three or four days per week as of February 2017 and was able to rent a car and file a police report for a stolen car in January 2016; and (5) records indicate that plaintiff's condition had done well with treatment, that she had a normal range of motion and, at worst, a slow, slightly antalgic gait, and that she reported significant improvement in her pain symptoms after the placement of the pain pump, indicating that she was happy with her level of pain control. *Id.* at 28-29.

The Court finds that the ALJ failed to provide clear and convincing reasons for rejecting plaintiff's symptom testimony. First, the ALJ merely listed the activities plaintiff reported— laundry, vacuuming, dusting, cleaning toilets and showers, driving, and going shopping in stores— and incorrectly labeled them as "daily" activities, without discussing further the extent and level of plaintiff's engagement in those activities. According to the May 2015 function report that the ALJ cited, plaintiff reported that it took her six to seven hours over two days to do laundry, that she vacuumed bimonthly and cleaned the bathroom monthly, and that she needed help to do these tasks. *Id.* at 258. Additionally, she noted that she took very short showers a few times a week, dressed

20

slowly, and sat on the bed to put on shoes.  *Id.* at 257.  She also reported that she did not cook "because it is too painful" and instead ate frozen foods and premade foods that she could heat up. *Id.* at 258.  She claimed that she could not take long rides in a car and did grocery shopping once a week.  *Id.* at 257, 259.

The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way distract from her credibility as to her overall disability."  *Vertigan*, 260 F.3d at 1050. The Social Security Act also "does not require that claimants be utterly incapacitated to be eligible for benefits."  *Fair v. Brown*, 885 F.2d 597, 603 (9th Cir. 1989).  A plaintiff may engage in activities such as "walking in the mall and swimming" for "therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved."  *Vertigan*, 260 F.3d at 1050.  Here, plaintiff reported doing household chores at the frequency and to the extent that her tolerance for pain allowed her, and these activities are consistent with her testimony that, prior to receiving the pain pump, she spent five to seven hours a day lying down.  *See* AR at 63.  Additionally, these activities are consistent with Dr. Weisbein's opinion about plaintiff's functional limitations: that plaintiff could stand or walk for up to two hours at a time, could lift or carry up to five pounds up to two hours, but could not stoop, kneel, or crouch. Accordingly, the Court disagrees with the ALJ that these activities constitute "daily activities, which are not limited to the extent one would expect, given [plaintiff's] complaints of disabling symptoms and limitations."  *See id.* at 28.

Second, plaintiff's reports about her internship, volunteer, and gym activities do not provide clear and convincing reasons to reject her symptom testimony.  As the ALJ noted, plaintiff testified that at the internship, which lasted from the summer of 2013 until the summer of 2014, she worked a maximum of one hour at a time for a total of about five hours a week.  *Id.* at 28, 53-54.  In September 2013, she traveled to Idaho for a five-day intensive equine therapy training, where she missed most of the morning sessions because she could not get up and sit; she often went back to her hotel room to lie down.  *Id.* at 59-60.  The ALJ also noted that plaintiff began volunteering for the Jameson Animal Rescue Ranch in early 2016, spending two days a week for a few hours at a

time collecting signatures for a ballot initiative. *Id.* at 28-29, 69-70. Yet, the ALJ did not elaborate further on how these activities were inconsistent with disability or with plaintiff's alleged symptoms. The internship took place in 2013 and 2014, before the pump placement in 2015, during which time plaintiff testified that she spent five to seven hours a day lying down due to pain, *id.* at 63, and Dr. Weisbein opined that plaintiff needed to spend up to eight hours in an eight-hour workday lying down. *Id.* at 26, 445. Such limitation explains why plaintiff was able to work only one hour at a time during the internship. Moreover, plaintiff's report that she collected signatures for a ballot initiative for a few hours at a time is consistent with Dr. Weisbein's opinion that plaintiff could walk for up to two hours at a time during that period. *See id.* at 445, 512, 866, 875.

Additionally, as discussed in section I, *supra*, a passing reference to plaintiff going to the gym three to four times per week, without any inquiry into or detail describing what those gym visits entailed or how long they lasted, cannot be a clear and convincing reason to reject plaintiff's symptom testimony. Plaintiff testified as to the reduced pain following the pump placement in December 2015; hence, it is possible that her pain had become tolerable enough by February 2017 for her to return to the gym. In sum, these activities are not inconsistent with plaintiff's alleged symptoms or with the medical evidence, and thereby do not serve as clear and convincing reasons for the ALJ's rejection of plaintiff's symptom testimony.

Lastly, the ALJ's finding of inconsistency largely results from failing to link the parts of plaintiff's statements to the parts of the medical record that chronologically correspond. The ALJ found that "the medical evidence of record does not entirely support the claimant's allegations regarding her physical impairments." *Id.* at 29. In stating that "[o]verall, treatment notes indicate that the claimant's condition has done well with treatment," the ALJ cited to the evidence that plaintiff "reported significant improvement in her pain symptoms after the placement of her spinal pain pump," and that "she was happy with her level of pain control." *Id.* The ALJ's statement that "[plaintiff's] condition has done well with treatment" is applicable only to the time period following the pump placement, and therefore the ALJ erred by using the evidence of plaintiff's improved condition following the December 2015 pain pump placement as a basis to reject the entirety of her testimony. As to the period between 2013 and the pump placement in 2015, plaintiff testified,

"[T]here [was] a lot of radiated pain from the low back.  Sitting was the worst.  Standing and moving around were more tolerable than sitting in one position."  *Id.* at 63.  She also claimed that, during this period, she spent five to seven hours a day lying down.  *Id.*  These statements by plaintiff are consistent with the medical records leading up to the December 2015 pump placement, including the medical source statements of Dr. Weisbein and FNP Schwartz.  *See, e.g., id.* at 357-65, 438-42, 443-49, 493.  The ALJ failed to consider such medical evidence that preceded the pump placement and instead focused on evidence and reports that followed the pump placement as a reason to reject all of plaintiff's symptom testimony for the entire alleged disability period.  The Court finds that, in doing so, the ALJ erroneously reached the conclusion that the entirety of plaintiff's symptom testimony was inconsistent with medical evidence and other records when in fact it was not.  Accordingly, the ALJ improperly rejected plaintiff's symptom testimony without providing clear and convincing reasons for doing so.

### III.    Opinion of FNP Schwartz

Plaintiff argues that the ALJ improperly discounted the opinion of FNP Schwartz.  Plaintiff contends that FNP Schwartz's opinion should be treated as from an acceptable medical source, since FNP Schwartz and Dr. Weisbein were part of the pain treatment team and they both signed the opinion.  Plaintiff further argues that, regardless of whether FNP Schwartz's opinion is treated as an accepted medical source or an "other" source, the ALJ failed to provide legally valid reasons to reject her opinion.  Defendant disputes that FNP Schwartz should be treated as an acceptable medical source.[9]

Both parties agree that if FNP Schwartz is considered an "other source," the ALJ must give "germane reasons" for discounting her testimony.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010)).  Germane reasons may include a finding that the testimony conflicts with the witness's own earlier assessment

---

[9] The Social Security regulations since have changed, and for claims filed on or after March 27, 2017, a licensed advanced practice registered nurse is now deemed an acceptable medical source. 20 C.F.R. § 416.902.

United States District Court
Northern District of California

1    or with the opinion of other medical specialists, or a finding that the witness was biased.  *Dale v.*

2    *Colvin*, 823 F.3d 941, 944-45 (9th Cir. 2016).

3         Additionally, the regulations state that the ALJ will consider the opinions from medical

4    sources *who are not acceptable medical sources* "using the same factors as listed in paragraph (c)(1)

5    through (c)(6) in this section," that is, the factors for weighing medical opinions discussed in Section

6    I, *supra*.  *See* 20 C.F.R. § 404.1527(f)(1).  "Depending on the particular facts in a case, and after

7    applying the factors for weighing opinion evidence, an opinion from a medical source who is not an

8    acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source .

9    . . .  For example, it may be appropriate to give more weight to the opinion of a medical source who

10   is not an acceptable medical source if he or she has seen the individual more often than the treating

11   source, has provided better supporting evidence and a better explanation for the opinion, and the

12   opinion is more consistent with the evidence as a whole."  *Id.*  The regulations further state that the

13   ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure

14   that the discussion of the evidence in the determination or decision allows a claimant or subsequent

15   reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the

16   outcome of the case."  *Id.* § 404.1527(f)(2).

17        The Court need not reach the question of whether FNP Schwartz is an "other source" or an

18   "acceptable medical source" because, even if she is considered an "other source," the Court finds

19   the ALJ failed to give germane reasons for affording her opinion "little weight."  *See* AR at 25.  Nor

20   did the ALJ apply the factors for weighing opinion evidence, as required by the regulations.

21        The records indicate that FNP Schwartz treated plaintiff since as early as February 2015 and

22   at least until August 2016.  *See id.* at 369, 909.  FNP Schwartz submitted a medical source statement

23   and a treating physician general medical evaluation dated May 22, 2015.  *Id.* at 438-42, 508-09.  She

24   opined that plaintiff could lift or carry less than five pounds, could stand or walk twenty minutes at

25   a time and less than two hours in an eight-hour workday, and could sit for twenty minutes at a time

26   and less than six hours in an eight-hour workday.  *Id.* at 438, 508.  She also noted that plaintiff

27   needed to alternate between sitting and standing, needed to change positions frequently, and needed

28   to lie down.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The ALJ provided the following reasons for rejecting FNP Schwartz's opinion: (1) that the

2    limitations in her opinion are "too extreme" and are not consistent with plaintiff's activities of

3    record, including studying for the Master's degree, working in a retail store, volunteering at Jameson

4    Animal Rescue Ranch collecting signatures for a ballot initiative, "completing an internship, and

5    meeting directly with clients to provide counseling"; (2) that her opinion "is not supported with any

6    explanation in her evaluation questionnaire completed on the same date"; and (3) that her opinion

7    is "inconsistent with treatment notes" indicating that plaintiff had a normal range of motion and gait,

8    that plaintiff's use of the implanted pain pump was effective, that plaintiff's pain was much

9    improved, and that plaintiff was happy with her level of pain control. *Id.* at 25.

10    The Court finds that the ALJ's rejection of FNP Schwartz's opinion is erroneous for several

11    reasons.  First, as discussed above with respect to the ALJ's rejection of Dr. Weisbein's opinions,

12    merely stating that an opinion is "too extreme" without providing any further explanation is

13    conclusory.  Second, the records and treatment notes cited by the ALJ are either consistent with FNP

14    Schwartz's opinion or are inconsistent only because they were made after the pump placement

15    (while FNP Schwartz's opinion was made before it).  For instance, plaintiff worked in a retail store

16    and volunteered at Jameson Animal Rescue Ranch in 2016, i.e., when she had better control of her

17    pain following the December 2015 pump placement.  However, FNP Schwartz submitted the

18    medical source statement in May 2015, predating the pump placement.  Therefore, the ALJ's

19    comparison between FNP Schwartz's opinion and plaintiff's reported activities is not

20    chronologically valid and is not a germane reason to reject FNP Schwartz's opinion.

21    The ALJ also misstates that plaintiff completed an internship.  Plaintiff testified that she was

22    dismissed from her internship before she could amass the hours needed to cover the qualification.

23    *Id.* at 54-55.  Moreover, even when she was meeting directly with clients to provide counseling

24    before the dismissal, she was working no more than an hour at a time for a total of five hours a

25    week. *Id.* at 53.  This report is consistent with FNP Schwartz's opinion as to plaintiff's limitations

26    in sitting and standing.  Additionally, the fact that plaintiff studied for her Master's degree is not

27    inconsistent with FNP Schwartz's opinion because plaintiff testified that much of her work was

28    done online, while lying in bed. *Id.* at 51.

The Court notes that the ALJ disregarded the opinions of the treating physician and nurse, Dr. Weisbein and FNP Schwartz, in favor of the opinions of non-examining, non-treating consultants, Drs. Pancho and Allen.  In *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017), the Ninth Circuit held that it "ma[de] little sense" for the ALJ to disregard a certified nurse practitioner's testimony given "the prominent role that [the nurse] played in [plaintiff's] medical treatment," where no other medical professionals in the record treated plaintiff.  Moreover, the Ninth Circuit concluded that it was not a "germane reason" to reject a nurse's opinion for the mere fact that the opinion was listed on a check-box form as part of the assessment of plaintiff's residual functional capacity, particularly where the ALJ had access to the underlying treatment records.  *Id.*  Similarly here, the mere fact that a portion of FNP Schwartz's opinion in her evaluation questionnaire is listed on a check-box form without any explanation is not a germane reason to reject her opinion.  In sum, the Court finds that the ALJ improperly rejected FNP Schwartz's opinion without providing germane reasons and without weighing the factors for considering opinion evidence listed in 20 C.F.R. § 404.1527.

## IV.     Remedy

The remaining question is whether to remand for further administrative proceedings or for the immediate payment of benefits under the credit-as-true doctrine.  "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)).  However, under the credit-as-true rule, the Court may order an immediate award of benefits if three conditions are met.  First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"  *Id.* (quoting *Garrison*, 759 F.3d at 1020).  Second, the Court must "determine whether there are outstanding issues that must be resolved before a disability determination can be made, . . . and whether further administrative proceedings would be useful."  *Id.* (citations and internal quotation marks omitted).  Third, the Court then "credit[s] the discredited testimony as true for the purpose of determining whether, on the

record taken as a whole, there is no doubt as to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101). Even when all three criteria are met, whether to make a direct award of benefits or remand for further proceedings is within the district court's discretion. *Id.* (citing *Treichler*, 775 F.3d at 1101). In rare instances, all three credit-as-true factors may be met but the record as a whole still leaves doubts as to whether the claimant is actually disabled. *Trevizo*, 871 F.3d at 683 n.11. In such instances, remand for further development of the record is warranted. *Id.*

Here, the Court has already found that the ALJ failed to provide legally sufficient reasons for discrediting the medical opinions of Dr. Weisbein and FNP Schwartz and for discrediting plaintiff's symptom testimony. The Court further finds that, with respect to the period between May 31, 2013, and December 3, 2015 (the date of the pain pump placement), there are no outstanding issues to resolve and further administrative proceedings would not be useful. The medical record from this period is extensive, showing plaintiff's severe symptoms and functional limitations stemming from her back pain prior to the pain pump placement. Moreover, crediting the discredited testimony as true, there is no doubt as to plaintiff's disability during this period. The vocational expert testified that an individual with the limitations that Dr. Weisbein identified—being able to sit for thirty minutes, stand for two hours, and walk for two hours at most per workday, and/or being absent from work four days per month—would not be able to perform any of plaintiff's past work and that there would be no full-time jobs available to such a person. *See* AR at 74. **Therefore, the Court finds there is no doubt as to plaintiff's disability from May 31, 2013, through at least December 3, 2015. Accordingly, an immediate award of benefits for this specified period is appropriate.**

However, there is an outstanding issue—the exact disability cessation date—that must be resolved before a disability determination can be made with respect to the period following the December 2015 pump placement. Plaintiff requested a closed period of disability from May 31, 2013 through April 21, 2017, because on April 22, 2017, she began part-time employment for which she was paid above the "substantial gainful activity" level. *Id.* at 43. The record is not clear, however, whether using April 21, 2017 as the disability cessation date is proper. Therefore, further administrative proceedings on this question would be useful.

Plaintiff's testimony and other evidence indicate that the placement of the pain pump in December 2015 was a pivotal point in plaintiff's recovery process.  First, plaintiff testified at the September 2017 hearing that the pump placement drastically improved her condition.  She stated that, following "about two or three weeks" of discomfort and healing after the pump placement procedure, her pain level had not been "above a four," and that it was "a one or two most times, which to [her] is nothing."  *Id.* at 64.  Three or four months after the pump placement, she decided to try out part-time employment, which "did not increase [her] pain."  *Id.*  She testified that, once she had built up enough stamina, she was able to start working six to seven hours a day, though "not too many like directly right in a row."  *Id.* at 65.  She added that she "rebounded and recuperated pretty quickly."  *Id.*  The ALJ did not inquire about the timeline of such improvement in plaintiff's condition; moreover, medical records dated after the December 2015 pump placement are mostly about pump telemetry, reprogramming, and refill, and thus do not provide sufficient information about her limitations between January 2016 and April 2017.  Moreover, Dr. Weisbein's updated March 2017 medical source statement indicated that, if plaintiff were to attempt full-time work, plaintiff would be absent from work about one day per month.  *Id.* at 880.  However, the hearing transcript lacks any testimony from the VE as to whether jobs exist for a person who is absent from work one day per month.  *See id.* at 74-75 (testifying that no jobs exist for someone absent four days per month or two days per month).

Similarly, additional details about the type, level, and duration of exercise plaintiff was doing, and when she began engaging in these activities following the pain pump placement would shed more light on whether plaintiff was no longer disabled prior to April 21, 2017.  As previously discussed, by February 2017 plaintiff was going to the gym three to four times a week.  More information about these activities would be helpful for identifying the exact disability cessation date.

**On remand, the ALJ should gather additional evidence, including testimony, as needed, to determine at what date between December 4, 2015, and April 21, 2017, plaintiff's disability ended.**

1

**CONCLUSION**

2          For the foregoing reasons, and pursuant to sentence four of 42 U.S.C. § 405(g), the decision

3   of the Commissioner is **REVERSED**.  This matter is **REMANDED**:

4          (1) for immediate calculation and payment of benefits from May 31, 2013, through

5   December 3, 2015; AND

6          (2) for further administrative proceedings to determine when, between December 4, 2015,

7   and April 21, 2017, plaintiff's disability ended.

8

9          **IT IS SO ORDERED**.

10   Dated: June 29, 2020

11

12                                                                SUSAN ILLSTON
                                                                   United States District Judge